UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

FRANK NALI,

        Plaintiff,

v.                                     Case No. 2:07-cv-255
                                     HON. R. ALLAN EDGAR

MICHIGAN DEPARTMENT
OF CORRECTIONS, et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Frank Nali, an inmate currently confined at the Parr Highway Correctional Facility, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against the Michigan Department of Corrections (MDOC), several of its institutions, several MDOC officials and employees, and various health care professionals. Plaintiff alleges that Defendants have failed to house him in a smoke-free environment, which he requires because he suffers from a serious medical condition. Plaintiff states that he was subjected to severe restrictions on bathroom access, was deprived of access to the courts, and was transferred in retaliation for filing grievances. Finally, Plaintiff states that Defendants acted negligently with regard to his need for medical treatment and safety while at the Kinross Correctional Facility, where Plaintiff was injured as the result of a slip and fall.

Plaintiff's complaint was initially filed in the Eastern District of Michigan, and on May 29, 2007, United States District Judge Arthur J. Tarnow dismissed Defendants MDOC, Kinross Correctional Facility (KCF), Hiawatha Correctional Facility, Saginaw Correctional Facility, Hearing Officer Theut, and R. Kukec. The case was transferred to this court on December 21, 2007. On

January 9, 2008, the court ordered Plaintiff to file an amended complaint setting forth his claims against Defendants Linda Metrish, Wendy Ball, Gerald Covert, Craig Maloney, Kenneth Searles, Michael Pellar and Gatha McClellan. Plaintiff filed an amended complaint on January 28, 2008, which failed to list those Defendants in the caption and included claims against Defendants MDOC, KCF, Caruso and Haas, who had previously been dismissed from this action.

Plaintiff alleges that he was transferred to KCF on January 25, 2006. Plaintiff asked for writing paper, but was told that there was not any paper. Plaintiff then sent a kite to Defendant Metrish, to no avail. Plaintiff claims that Defendant Metrish breached her duty to make sure that there was a reasonable amount of free writing materials available, which constituted negligence and violated his right of access to the courts.

Plaintiff asserts that on March 7, 2006, he slipped and fell while at KCF and hurt his left knee cap. Plaintiff states that he was placed in a wheelchair and taken to the health care building. Plaintiff was initially seen by Defendant Ball, who failed to provide Plaintiff with an ice pack, so that Plaintiff suffered from rapid swelling and tissue damage. Thereafter, the transport officers ordered Plaintiff out of the wheelchair and forced him to walk from the facility to a transport van, approximately 50 yards away, using uneven crutches without any underarm pads. Plaintiff had no prior experience with using crutches and hobbled in pain while being chained and handcuffed. Plaintiff was also required to climb unassisted into the van while handcuffed, which forced him to use his injured leg and caused him to scream in pain. In addition, Plaintiff had to remain on his back for the entire trip to the hospital with his injured leg hanging off the seat, causing excruciating pain every time the van hit a bump.

Plaintiff claims that Defendant Metrish failed to establish policies to ensure that walkways were clear and safe. Plaintiff claims that other inmates had suffered falls prior to Plaintiff,

so that Defendant Metrish was aware of the danger, but that Defendant Metrish failed to take appropriate precautions to provide a safe walkway. Plaintiff was in a leg immobilizer for months and could not participate in programming or activities. Plaintiff alleges that Defendants Haas and Metrish failed to provide him with the proper facilities and that he could not use the toilet or shower for days, which led to him becoming constipated and developing a rash. Plaintiff states that he suffered permanent injuries and cannot climb stairs, walk without assistive devices, or function normally. Plaintiff asserts that he suffers from back problems because of his abnormal gait, which has produced compression of his sciatic nerve and that he suffers continuous pain. Plaintiff's knee, quadriceps tendon, and muscle above the patella are obviously deformed. Plaintiff cannot extend his left knee and has lost the knee jerk reflex.

Plaintiff was scheduled to see Dr. Berhane on March 29, 2006, but Defendant Metrish had Plaintiff transferred to the Hiawath Temporary Correctional Facility (HTF) before Plaintiff could see the doctor. Defendant Metrish knew that there was no regular doctor at HTF because she was warden at both facilities. Plaintiff claims that he has a history of heart disease, high blood pressure, hypercholesterolemia, hypothyroidism, arthritis and Raynaud's Syndrome. Plaintiff states that Defendant Covert denied him both physical therapy and assistive devices to help him ambulate without falling, which happened on several occasions.

Plaintiff alleges that on April 16, 2006, while he was confined at HTF, he requested a copy of his medical records by filling out a medical release form. Plaintiff was denied the records despite being indigent. Defendants Metrish, Maloney and McClellan consistently denied Plaintiff nutritionally adequate foods and served Plaintiff foods high in fat and cholesterol, and low in fiber, protein, and vitamin C. Plaintiff complains that Defendants do not provide appropriate diets for prisoners with special medical needs, such as himself.

Plaintiff contends that Defendant Metrish maintained policies that prevented him from obtaining legal photocopies as an indigent prisoner, which violated Plaintiff's right of access to the courts. Plaintiff alleges that on August 3, 2006, Defendant Covert placed Plaintiff on a "no weight pit" detail. On August 8, 2006, Defendants Peller and Searles wrote a major misconduct ticket on Plaintiff for being "out of place" because Plaintiff was in the weight pit in order to perform exercises to rehabilitate his injured leg. Plaintiff claims that he understood the "no weight pit" detail to mean that he could not be assigned a job in the weight pit, and that Defendants Pellar and Searles should have explained that he could not use the weight pit for any purpose. Plaintiff states that this misconduct conviction reduces his ability to be paroled.

Plaintiff alleges that when he was transferred to HTF from KCF, Defendant Metrish knew that Plaintiff needed to be in a smoke free environment, but failed to inform HTF personnel of this need. Plaintiff asserts that he was placed in a "smoke-filled gas chamber" and experienced frequent episodes of chest pain, coughing, headaches, shortness of breath, fatigue, insomnia, nose bleeds, and general deterioration of his health as a result of this exposure. Plaintiff also states that because he was laid in due to his leg injury, he could not escape the smoke filled atmosphere. Plaintiff claims that Defendants' conduct violated his rights under the United States Constitution, the Americans with Disabilities Act (ADA), and state law (docket #56).

On June 2, 2008, the court granted Defendants' motion to revoke pauper status and, on July 23, 2008, the court dismissed this action for failure to pay the filing fee. Plaintiff filed an appeal of the dismissal and, on April 15, 2009, the Sixth Circuit Court of Appeals issued an order reversing the dismissal and remanding the case to this court for consideration of the merits of Plaintiff's claims.

Presently before the Court are the Defendants' Motion to Dismiss or Strike Amended Complaint (docket #57), Defendants' Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56 (docket #60), and Plaintiff's Motion to Amend/Correct (docket #69). Plaintiff has filed responses (docket #68, #73), Defendants have filed a response to Plaintiff's motion to amend (docket #71), Plaintiff has filed a reply to that response (docket #75), and the matter is ready for decision. Because both sides have asked that the Court consider evidentiary materials beyond the pleadings, the standards applicable to summary judgment apply. *See* Fed. R. Civ. P. 12(b).

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue

of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

In their motion to dismiss or strike the amended complaint (docket #57), Defendants assert that the amended complaint (docket #56) fails to comply with the court's January 9, 2008, order directing him to list only his claims against Defendants Linda Metrish, Wendy Ball, Gerald Covert, Craig Maloney, Kenneth Searles, Michael Pellar and Gatha McClellan and includes claims against Defendants MDOC, KCF, Caruso and Haas, who had previously been dismissed from this action. A review of Plaintiff's amended complaint reveals that Plaintiff names Defendants Metrish, Haas, Ball, Covert, McClellan, Maloney, Peller and Searles in the body of his complaint. The fact that Plaintiff failed to list the Defendants in the caption does not require that the court disregard the contents of the amended complaint. However, the court need not consider Plaintiff's claims against the previously dismissed Defendants. Therefore, the undersigned recommends that Defendants' motion to dismiss or strike amended complaint (docket #57) be denied.

In their motion for summary judgment, Defendants Metrish, Ball, Covert, Maloney, McClellan, Peller and Searles contend that they are entitled to summary judgment on Plaintiff's Eighth Amendment claims related to Plaintiff's slip and fall. Initially, the undersigned notes that Plaintiff claims that Defendant Metrish's deliberate indifference was responsible for the conditions leading to his fall. The Cruel and Unusual Punishments Clause of the Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of crime. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Trop v. Dulles*, 356 U.S. 86 (1958). The clause therefore prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346.

An Eighth Amendment claim comprises objective and subjective components: (1) a sufficiently grave deprivation and (2) a sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834 1977 (1994); *Woods v. LeCureux*, 110 F.3d 1215, 1222 (6th Cir. 1997). A prison official cannot be found liable unless the official has acted with deliberate indifference; that is, the official must know of and disregard an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837; *see also Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991) (deliberate indifference standard applies to all claims challenging conditions of confinement to determine whether defendants acted wantonly). The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference. *Farmer*, 511 U.S. at 837. Thus, the mental state required for an Eighth Amendment claim is not actual intent, but something close to common-law recklessness. *Hubbert v. Brown*, Nos. 95-1983, 95-1988, 96-1078, 1997 WL 242084, at *5 (6th Cir. May 18, 1997) (relying on *Farmer*, 511 U.S. at 836 n.4.

The reason for focusing on a defendant's mental attitude is to isolate those defendants who inflict punishment. *Farmer*, 511 U.S. at 839. The deliberate indifference standard "describes a state of mind more blameworthy than negligence." *Id.* at 835; *see also Whitley v. Albers*, 475 U.S. 312, 319 (1986) ("conduct that does not purport to be punishment at all must involve more than the ordinary lack of due care for the prisoner's interests or safety"). As the Supreme Court explained:

> The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837-38 (citations omitted). Thus, accidents, mistakes, and other types of negligence are not constitutional violations merely because the victim is a prisoner. *Acord v. Brown*, No. 93-2083, 1994 WL 679365, at *2 (6th Cir. Dec. 5, 1994) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Rather, what is required is a conscious disregard of a substantial risk of harm. *Farmer*, 511 U.S. at 839.

        The undersigned notes that while an icy prison yard walkway presents the possibility for an inmate to slip and fall, it does not pose a substantial or excessive risk of serious harm. *See Brown v. Lafler,* No. 07-14955, 2008 WL 4937951, *2 (E.D.Mich. Nov.13, 2008) (Cohn, J. adopting magistrate judge's report finding that prisoner's complaint of injury arising from failure to clear icy prison walkway did not state an Eighth Amendment claim). Federal courts have consistently held that icy walkways and slippery prison floors do not give rise to a constitutional violation. *See White v. Tyszkiewicz,* 27 Fed. Appx. 314, 315 (6th Cir.1994) (affirming dismissal of prisoner's civil rights complaint arising from slip and fall on ice); *accord Atkins v. Sheriff's Jail Avoyelles Parish,* 278 Fed. Appx. 438, 439 (5th Cir.2008) (upholding dismissal of slip and fall complaint as frivolous and for failure to state a claim); *Reynolds v. Powell,* 370 F.3d 1028, 1031 (10th Cir.2004) (ruling that plaintiff failed to show that standing water problem known to prison officials posed substantial risk of serious harm); *Bell v. Ward,* 88 Fed. Appx. 125, 127 (7th Cir.2004) (wet floors do not pose a substantial risk of serious harm); *LeMaire v. Maass,* 12 F.3d 1444, 1457 (9th Cir.1993) ("slippery prison floors ... do not even state an arguable claim for cruel and unusual punishment"). Therefore, the undersigned recommends that Defendant Metrish be granted summary judgment with regard to Plaintiff's claim that his fall was due to Defendant Metrish's deliberate indifference.

        Plaintiff also claims that Defendants Metrish and Covert deprived him of adequate treatment for his injuries following his slip and fall. A claim for the deprivation of adequate medical

care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In

order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer*, 62 F.3d at 154-55; *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

According to Plaintiff's medical records, on March 7, 2006, Plaintiff fell on ice and felt a snap in his left knee. Plaintiff's left knee was tender and unable to be bent. Plaintiff was taken to the emergency room, a knee immobilizer was placed on Plaintiff, and he was given crutches. Plaintiff was to follow up with the medical service provider at the prison the following morning. (Defendant's Exhibit J, pp. 397-399.) On March 8, 2006, Plaintiff was seen by Dr. Berhane, who examined Plaintiff and recorded that Plaintiff had suffered a lateral cruciate ligament sprain. Plaintiff's knee was observed to have mild soft tissue swelling and reduced range of motion. Dr. Berhane stated that Plaintiff was to keep the leg brace for a week, at which point his condition would be reassessed. (Defendant's Exhibit J, pp. 393-394.) On March 14, 2006, Plaintiff's orders for crutches, knee immobilizer and lay-in were extended to March 21, 2006. (Defendant's Exhibit J, p. 388.) Plaintiff was seen by Dr. Berhane on March 16, 2006, who noted that Plaintiff continued to complain of pain in his left knee, and that he was unable to walk using his left leg and could not extend or flex the left knee. In addition, Plaintiff complained of pain and exhibited mild swelling and redness around the knee, as well as a bruise on the posterior portion. Dr. Berhane indicated that he would request an MRI. (Defendant's Exhibit J, p. 383.) On March 21, 2006, R.N. Carol

Williams noted that Plaintiff's order for crutches, unit lay-in and knee immobilizer were extended to April 16, 2006. (Defendant's Exhibit J, p. 378.) On March 23, 2006, Defendant Ball completed a medical transfer form, noting that Plaintiff's medical needs could be met at any facility. (Defendant's Exhibit J, p. 374.) On March 31, 2006, Plaintiff was examined by Penny Rogers, N.P., who summarized Plaintiff's medical condition and noted that Plaintiff continued to have left knee symptoms from his fall. Rogers stated that she would discontinue the knee immobilizer and order an ACE wrap to allow Plaintiff more flexibility in his left knee joint. In addition, she stated that Plaintiff was to continue with crutches and Motrin for pain, and was to be referred to Dr. Ayer to see if the effusion on the joint could be drained. (Defendant's Exhibit J, pp. 356-367.)

Plaintiff had an MRI on either July 12 or 13 of 2006, which showed a mild sprain of Plaintiff's left anterior cruciate ligament. (Defendant's Exhibit J, pp. 138, 164.) On January 2, 2008, Dr. Roberto A. Viguilla ordered an ACL brace because Plaintiff continued to experience instability in his left knee. Dr. Viguilla determined that Plaintiff's left knee instability was likely the result of a chronic sprain of the ACL. (Defendant's Exhibit J, pp. 33-35.) On February 12, 2008, Plaintiff kited medical services regarding his knee and was advised that he had some degenerative changes to the knee, but did not have a meniscal tear and all of his ligaments were intact. Plaintiff was told that he would be following up with Dr. Viguilla in early March and that he might put in a request for orthopedics, but that it was unlikely because Plaintiff's MRI was normal. (Defendant's Exhibit J, p. 11.)

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the

treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). As noted above, Plaintiff was seen on numerous occasions by medical personnel for his knee injury and was given an MRI, a knee brace, crutches and a period of time for a medical lay-in. Finally, the undersigned notes that Plaintiff was seen by medical personnel on sixty-three separate occasions between February 3, 2006, and February 4, 2008. (Defendant's Exhibit J, pp. 9-10.) The fact that Plaintiff did not receive physical therapy following his injury does not rise to the level of deliberate indifference. In addition, the fact that Plaintiff was transferred to HTF does not appear to have deprived him of medical care. Therefore, the undersigned recommends that Defendants be granted summary judgment with regard to Plaintiff's claim that he was denied adequate medical care following his slip and fall.

Plaintiff also claims that Defendants Metrish, Maloney and McClellan deprived him of nutritionally adequate foods. Plaintiff claims that the foods provided to him are high in fat and cholesterol and low in fiber. In his affidavit, Defendant Maloney attests that he is the Assistant Food Director at HTF and that the menus at that facility are evaluated annually to ensure that they provide adequate nutrition. (Defendants' Exhibit F, p. 1.) In addition, Defendants offer Cycle Menu Reviews for 2006 and 2007, showing that the menus had acceptable levels of all nutrients. (Defendants' Exhibits F-2 and F-3.) Defendant McClellan attests that she is the MDOC Food Service Program Manager and that the nutritional breakdown for MDOC menus complies with the DRI / Dietary Guidelines. (Defendants' Exhibit G.) Plaintiff has failed to come forward with any

support for his conclusory assertion that he was not provided with nutritionally adequate meals. Therefore, Defendants Metrish, Maloney and McClellan are entitled to summary judgment on this claim.

Plaintiff claims that Defendant Metrish violated his Eighth Amendment rights by failing to place him in a smoke-free environment when Plaintiff was transferred to HTF. When prison officials ignore a prisoner's serious medical condition such as allergy or asthma relating to second-hand smoke and do not make a good-faith effort to enforce non-smoking policies or to segregate a prisoner from exposure to smoke, a prisoner may state an Eighth Amendment claim based upon exposure to environmental tobacco smoke. *See Talal v. White*, 403 F.3d 423, 426 (6th Cir. 2005)(citing *Hunt v. Reynolds*, 974 F.2d 734, 726 (6th Cir. 1992)).

In her affidavit, Defendant Metrish attests that all MDOC facilities, including HTF, are smoke-free. In addition, Defendant Metrish states that although some prisoners violate the no-smoking rule, staff do their best to monitor the situation and quell problems by issuing misconduct tickets. Defendant Metrish states that prisoners who are housed in "tobacco-free" units and who violate the rules, are removed from that unit. When Plaintiff was transferred to HTF, he was initially placed in A-unit in order to accommodate his leg brace and crutches because that unit is closer to chow hall. However, Plaintiff complained that the unit was not tobacco free and was transferred to H-unit, the tobacco free unit, on April 11, 2006. (Defendants' Exhibit A, pp. 3-4.)

*Helling v. McKinney,* 509 U.S. 25 (1993), is the seminal Supreme Court case in this area. In *Helling*, a prisoner initiated a § 1983 action against prison officials claiming that his involuntary exposure to ETS from a cellmate[1] posed an unreasonable risk of serious damage to his

---

[1]The cellmate in *Helling* smoked five packs of cigarettes a day. *Helling,* 509 U.S. at 35.

future health in violation of the Eighth Amendment. *Helling*, 509 U.S. at 35. The Supreme Court affirmed the decision of the Court of Appeals to remand the case to the district court to allow the prisoner an opportunity to prove his case, which also required the prisoner to prove both the subjective and objective elements necessary for an Eighth Amendment violation. *Id.* Relevant to the objective element is whether the prisoner endured unreasonably high exposure to ETS that society would consider violative of contemporary standards of decency. *Id.* at 35-36. Relevant to the subjective element is whether prison officials had exhibited deliberate indifference with regard to the dangers of a prisoner's exposure to ETS. *Id.* at 36.

Plaintiff fails to satisfy the objective component for an Eighth Amendment violation. To prove the objective element, the prisoner must first show that he has been exposed to unreasonably high levels of ETS.[2] *Id.* at 35. "More than mere scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will be caused by exposure to ETS" is necessary to establish the objective component. *Id.* at 36. Second, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id.* Plaintiff failed to allege any facts quantifying his level of exposure. Plaintiff's conclusory allegations regarding the level of ETS to which he was exposed fail to support the objective component of an Eighth Amendment claim. *See Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996); *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986); *Smith v. Rose*,

---

[2]"Plainly relevant to this determination" was the fact that plaintiff in *Helling* had been moved to a different prison and was "no longer the cellmate of a five-pack-a-day smoker." *Helling*, 509 U.S. at 35. The Supreme Court also observed that the prison had adopted a formal smoking policy restricting smoking to certain areas and where wardens could, contingent on space availability, designate non-smoking areas in dormitory sections. *Id.* at 35-36. The Supreme Court noted that the changed policies could make it impossible for the plaintiff to prove that he would be exposed to an unreasonable risk of ETS with respect to his future health. *Id.* at 36.

760 F.2d 102, 106 (6th Cir. 1985); *Turnboe v. Stegall*, No. 00-1182, 2000 WL 1679478, at *2 (6th Cir. Nov. 1, 2000).

The Supreme Court in *Helling* did not mandate smoke free prisons. *Williams v. Howes,* No. 1:05-cv-817, 2007 WL 1032365, at *14 (W.D. Mich. Mar. 30, 2007) (citing *Scott v. Dist. of Columbia*, 139 F.3d 940, 942 (D.C. Cir. 1998) and *Mansoori v. Lappin,* No. 04-3241-JAR, 2007 WL 401290, at *10 (D. Kan. Feb. 1, 2007)). A prisoner's exposure to smoke must cause more than mere discomfort or inconvenience. *Talal v. White,* 403 F.3d 423, 426 (6th Cir. 2005). Plaintiff does not allege any facts suggesting that his exposure to ETS caused him anything beyond discomfort. Within less than two months of Plaintiff's transfer to HTF, Defendants assigned Plaintiff to a tobacco-free housing unit. *See Oliver v. Deen*, 77 F.3d 156, 159-61 (7th Cir. 1996) (an asthmatic inmate's assignment to cells with smoking inmates for 133 days resulting in ETS exposure which aggravated the plaintiff's asthma and necessitated his increased use of an inhaler failed to satisfy the objective component); *Williams,* 2007 WL 1032365, at *15 (asthmatic inmate's exposure to ETS during a seven-month period failed to satisfy the objective component).

Plaintiff further fails to meet the subjective element of the *Helling* test, i.e., that Defendants were deliberately indifferent to his exposure to unreasonably high levels of ETS. The total time period at issue in this case was less than two months, March 24, 2006 to April 11, 2006. After Plaintiff brought the issue to Defendants' attention by way of a grievance, Plaintiff was transferred to tobacco-free housing unit. In addition, Defendant Metrish attests that she checked the A-unit log book and found no complaints to staff about smoking in A-unit while Plaintiff was confined in that unit. (Defendants' Exhibit A, p. 4.) Policy Directive 01.03.140 states that smoking is prohibited in prisoner housing units. *See* Mich. Dep't of Corr., Policy Directive 01.03.140, ¶ B. The adoption of the MDOC's no smoking policy and the prison officials' current attitude and

conduct, which reflect a "zero tolerance" for smoking in the housing units, bears heavily on the deliberate indifference inquiry.[3] *Helling*, 509 U.S. at 36. It is well established that imperfect enforcement of a non-smoking policy does not rise to the level of deliberate indifference. *Talal*, 403 F.3d at 427; *Wilson v. Hofbauer*, 113 F. App'x 651, 652 (6th Cir. 2004) (imperfect enforcement of MDOC Policy Directive 01.03.140, which prohibited smoking in all occupied buildings, including housing units, "show[ed], at most, negligence by the defendants, rather than deliberate indifference"); *Moorer v. Price*, 83 F. App'x 770, 773 (6th Cir. 2003) (imperfect enforcement of MDOC Policy Directive 01.03.140 does not equate to deliberate indifference). Therefore, I recommend that Defendant Metrish be granted summary judgment on this claim.

Plaintiff also claims that Defendant Metrish violated his First Amendment right of access to the courts. Defendant Metrish claims that she is entitled to summary judgment on this claim. It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners. *Id.* at 817. The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them." *Id.* at 824-25. An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit. In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey*

---

[3] The Court notes that the Michigan Department of Corrections (MDOC) recently updated Policy Directive 01.03.140 on February 1, 2009. The new policy prohibits smoking by offenders and MDOC employees inside all MDOC buildings and within 100 feet of any entrance to those buildings. MICH. DEP'T. OF CORR., Policy Directive, ¶ G (effective Feb. 1, 2009).

*v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1, 1999); *Knop v. Johnson*, 977 F.2d 996, 1000 (6th Cir. 1992); *Ryder v. Ochten*, No. 96-2043, 1997 WL 720482, *1-2 (6th Cir. Nov. 12, 1997). In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Lewis*, 518 U.S. at 351-353; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996).

        Plaintiff claims that he was denied paper, free copies of his medical records, and legal photocopies in the same manner as those given to non-indigent prisoners. Defendants offer the affidavit of Kimberly Mosca, an Assistant Resident Unit Supervisor at KCF, who attests that one of her job duties is to order lined paper, and that she typically sends in a new order when she has about 10 reams of paper left. In addition, Mosca states that envelopes are ordered on a bi-weekly basis or when needed. Prisoners are given a "reasonable" amount of lined paper (at least 10 sheets) per day upon request, and up to 10 envelopes per week for metering at the store. In addition, prisoners can purchase unlined paper from the prison store. Mosca states that although Plaintiff did not live on her wing, she recalls him coming to her office seeking paper on a frequent basis, often more than once a day. In addition, Plaintiff also had a habit of requesting extra paper from new officers. Mosca notes that the unit is never out of paper, and that she did not tell Plaintiff that she was out of paper on February 13, 2006, as asserted by Plaintiff. (Defendants' Exhibit H.)

        In addition, Debra S. Herbig, the KCF Librarian, attests that she is responsible for disbursing legal supplies to indigent prisoners and that on March 1, 2006, she received a kite from Plaintiff dated February 28, 2006, seeking indigent legal supplies. This kite referenced a prior kite dated February 14, 2006, but Herbig has no record of ever receiving such a kite. On March 1, 2006, Herbig placed Plaintiff on callout to receive an indigent legal supplies package, which consisted of

one large manila envelope, five sheets of carbon paper, 50 sheets of plain paper, one pen and one pencil. (Defendants' Exhibit I.)

Defendants also note that MDOC Policy Directive 05.03.115 allows prisoners to obtain copies of legal materials from law libraries for a reasonable fee. Indigent prisoners are allowed to have free photocopies of "necessary legal exhibits which cannot be copied by other means." The policy requires that indigent prisoners submit their documents to staff for review to determine whether the photocopying is necessary for litigation. (Defendants' Exhibit K.) In addition, pursuant to MDOC Operating Procedure 01.06.110A, prisoners may receive a loan to pay for photocopies of medical records only if the copies are necessary for litigation. (Defendants' Exhibit L.)

The Sixth Circuit has repeatedly held that the constitutional right of access to the courts does not entitle prisoners to free access to photocopying machinery. *See*, *e.g.*, *Bell-Bey, v. Toombs*, No. 93-2405, 1994 WL 105900 (6th Cir. March 28, 1994) ("the law is settled that an inmate does not enjoy a federal constitutional right to unlimited free photocopying services"); *Hawk v. Vidor*, No. 92-2349, 1993 WL 94007, *1 (6th Cir. March 31, 1993) ("the right to have access to the courts is not interpreted as requiring unlimited access to photocopiers"); *Al-Jabbar v. Dutton*, No. 92-5004, 1992 WL 107016, at *1 ("a prisoner's right of access to the courts does not guarantee him unlimited photocopying at the state's expense") (6th Cir. May 19, 1992); *Bond v. Dunn*, No. 89-6181, 1989 WL 149988, at *1 (6th Cir. Dec. 12, 1989) ("The constitutional right of access to the courts does not require that prison officials provide inmates free access to photocopying machinery"), *cert. denied*, 494 U.S. 1006 (1990); *Fazzini v. Gluch*, No. 88-2147, 1989 WL 54125, *2 (6th Cir. May 23, 1989) ("The right of access to the courts does not require that prison officials

provide free, unlimited access to photocopy machines"). In the absence of actual injury, plaintiff fails to state a claim of constitutional significance.

As noted above, Plaintiff must demonstrate actual injury to pending or contemplated litigation. *Dellis v. Corrections Corp. of America*, 257 F.3d 508, 511 (6th Cir. 2001)(citing *Lewis v. Casey*, 518 U.S. 343, 351 (1996)). Because Plaintiff has failed to show that he suffered any actual injury, Defendant Metrish is entitled to summary judgment on Plaintiff's access to courts claim.

Plaintiff also claims that his right to equal protection was violated because he was treated differently than non-indigent Defendants with regard to his request for copies. The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. CONST., amend. XIV; *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). In the opinion of the undersigned, Plaintiff's equal protection claim fails because he is not similarly situated to non-indigent prisoners. Non-indigent prisoners are required to pay for copies and other supplies. Because indigent prisoners are unable to do so, they must apply for a loan and comply with certain requirements in order to be granted the loan. Because Plaintiff is not similarly situated to non-indigent prisoners, his equal protection claim lacks merit.

Plaintiff also claims that Defendants violated his rights under the Americans with Disabilities Act (ADA). Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131, and Section 504 of the Rehabilitation Act of 1973 (RA), 29 U.S.C. 794(a). Title II of the ADA provides: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity." 42 U.S.C. § 12132. Therefore, to state a claim under the ADA, Plaintiff must show that he is a "qualified person," that he has a "disability," and that parole is a "service, program, or activity" of the state. In the ADA, the term "disability" is defined as, with respect to an individual: "[1] a physical or mental impairment that substantially limits one or more of the major life activities of such individual; [2] a record of such an impairment; or [3] being regarded as having such an impairment." 42 U.S.C. § 12102(2). Because individuals such as the remaining Defendants in this case are not public entities providing programs or activities to which the ADA applies, they cannot be liable in their personal capacities under the Act. *See Reickenbacker*, 274 F.3d at 975 n.9 (noting that plaintiffs withdrew their individual claims in the face of a statutory argument); *Key v. Grayson*, 163 F. Supp.2d 697, 715 (E.D. Mich. 2001) (following great weight of authority holding that individuals cannot be liable under Title II of the ADA); *Calloway v. Boro of Glassboro Dept. of Police*, 89 F. Supp.2d 543, 557 (D. N.J. 2000) (collecting decisions of the Eighth Circuit and various district courts holding that individuals cannot be liable under the ADA or RA). Therefore, Defendants are entitled to summary judgment on Plaintiff's ADA claims.

Defendants alternatively move for qualified immunity. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power

irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

In making a qualified immunity determination the court must decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 816. If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either approach without regard to sequence. *Id.* As previously discussed, because Plaintiff cannot establish that his constitutional rights were violated, Defendants are entitled to qualified immunity.

To the extent that Plaintiff is claiming his state law rights were violated, it is recommended that this court refuse to exercise pendent jurisdiction over such claims. Claims raising issues of state law are best left to determination by the state courts, particularly in the area of prison administration. In addition, pendent jurisdiction over state law claims cannot be exercised after all federal claims have been dismissed. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726-727, 86 S. Ct. 1130, 1139 (1966); *Moon v. Harrison Piping Supply, et al.*, 465 F.3d 719, 728 (6th Cir. 2006); *Smith v. Freland*, 954 F.2d 343, 348 (6th Cir.), *cert. denied*, 504 U.S. 915, 112 S. Ct. 1954 (1992).

> That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state

> issues substantially predominate, whether in terms of proof, of the
> scope of the issues raised, or of the comprehensiveness of the remedy
> sought, the state claims may be dismissed without prejudice and left
> for resolution to state tribunals.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 726-727, 86 S. Ct. 1130, 1139 (1966).

Finally, the undersigned notes that Plaintiff has filed a motion to amend his complaint, to include claims against Corrections Officers Mariuzza and Winkler, as well as Assistant Resident Unit Supervisor Mosca for the treatment he received after he injured his knee, and for the alleged denial of paper. However, as noted above, the record shows that Plaintiff's treatment following his knee injury did not violate the Eighth Amendment and Plaintiff's First Amendment claim lacks merit. Therefore, Plaintiff's motion to amend (docket #69) is properly denied as futile.

In summary, in the opinion of the undersigned, Plaintiff has failed to sustain his burden of proof in response to Defendants' motion for summary judgment. Accordingly, it is recommended that Defendants' motion for summary judgment (docket #60) be granted and that this case be dismissed in its entirety. In addition, the undersigned recommends that Defendants' motion to strike (docket #57) and Plaintiff's Motion to Amend/Correct (docket #69) be denied.

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the undersigned recommends granting Defendants' motion for summary judgment, the undersigned discerns no good-faith basis for an appeal. Should the court adopt the report and recommendation and should Plaintiff appeal this decision, the court will assess the $455 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from

proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455 appellate filing fee in one lump sum.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).


 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:   August 6, 2009